WAUKEEN Q. MCCOY (SBN 168228)
**LAW OFFICES OF WAUKEEN Q. McCOY**
703 Market Street, Suite 1407
San Francisco, CA  94103
Telephone:      (415) 675-7705
Facsimile:      (415) 675-2530

KAY McKENZIE PARKER (SBN 143140)
**LAW OFFICES OF KAY McKENZIE
PARKER**
1318 East Shaw Ave., Suite 415
Fresno, CA  93710
Telephone:      (559) 222-1509
Facsimile:      (559)  222-9045

Attorneys for PLAINTIFFS

GARY WHITE & ALEXANDER RIVERA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY WHITE, an individual, ALEXANDER RIVERA, an individual, Plaintiffs, <br><br> v. <br><br> FEDEX CORPORATION, a Delaware corporation, FEDEX EXPRESS, a Delaware corporation, GUY CAPRIELLO, an individual, PAUL FERREY, an individual, DONALD HEINZ, an individual, ROY JOHNSON, an individual, CHRISTOPHER MATTHEWS, an individual, GARY MEEK, an individual, ROBERT MONTEZ, an individual, ROBERT MOTTER, an individual, DAVID PERRY, an individual, MICHAEL PIGORS, an individual, STEVEN SEYMOUR, an individual, NORMAN STITES, an individual, ANGELA SUAZO, an individual, ROBIN VANGALDER, an individual, TIMOTHY WARTNER, an individual, and DOES 1 through 100, inclusive, Defendants. | Case No. C 04 0099 SI <br><br> **AMENDED COMPLAINT PURSUANT TO NOVEMBER 12, 2003 COURT ORDER OF HONORABLE SUSAN  ILLSTON:** <br><br> 1. **RACE DISCRIMINATION – 42 U.S.C. 1981;** <br><br> 2. **RACIAL DISCRIMINATION – DISPARATE TREATMENT - FEHA** <br><br> 3. **RACIAL DISCRIMINATION – DISPARATE IMPACT – FEHA** <br><br> 4. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;** <br><br> 5. **RETALIATION;** <br><br> 6. **RACIAL HARASSMENT;** <br><br> 7. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;** <br><br> 8. **FRAUD;** <br><br> 9. ***QUANTUM MERUIT*;** <br><br> 10. **EQUAL PAY ACT VIOLATION;** |

-1-

AND

11.   **INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

**PRELIMINARY STATEMENT**

1.     This is an employment discrimination action based on race and brought by two individual plaintiffs who were employees of defendant FedEx Express in the Northern District of California.  This action is related to the consolidated class action pending in this court identified as Derrick Satchell, et al. v. FedEx Corporation, Case Number 03-2659 SI; 03-2878 SI; and was authorized by order of this court dated November 12, 2003.  The plaintiffs in this action were originally named in the related class actions (03-2659 SI or 03-2878 SI) before the amendment.  Following the amendment to the complaint in the consolidated class action, they have opted to join their severed individual claims in the amended complaint herein.

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 1981.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiffs' state law claims, including those alleged under the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940, *et seq*.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) & (c).  Both Plaintiffs' claims arose in California, and the acts complained of herein occurred in this District and gave rise to the claims alleged.  Defendant operates over 100 facilities in California and employs thousands of workers in the State of California.  Defendant operates at least 10 facilities in the Northern District of California.

Plaintiffs Alexander Rivera (hereinafter "RIVERA"), Gary White (hereinafter "WHITE"), and DOES 1 through 100, inclusive, allege as follows:

AMENDED COMPLAINT                                                                        CASE NO. 04-0099 SI

## **THE PARTIES**

4.     Plaintiff RIVERA is an Asian Pacific Islander male formerly employed by defendant FEDEX as a Courier at the Sunnyvale Facility.  Plaintiff RIVERA was employed by FEDEX from approximately June 1997 to August 2001, at which time defendants wrongfully terminated his employment.

5.     Plaintiff WHITE is an African American male formerly employed by defendant FEDEX as a part-time Handler at the Sunnyvale Facility.  Plaintiff WHITE was employed by FEDEX from approximately November 1994 to March 2001, at which time defendants wrongfully terminated his employment.

6.     Plaintiffs were, non-Caucasian FEDEX employees, who have suffered from patterns and practices of racial discrimination and other wrongful acts by defendants, which patterns and practices of racial discrimination and other wrongful acts are ongoing and continuing to and including the present.  Plaintiffs are both similarly situated against the same defendants such that the interests of judicial economy are served by the assertion of plaintiffs' respective claims in a single action.

7.     Plaintiffs are informed and believe, and based thereon allege, that Defendant FEDEX CORP is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of Delaware with places of business, among other places, in the Northern District of California.  Plaintiffs are informed and believe that defendant FEDEX CORP controls, both directly and indirectly, the policies, decisions and other relevant acts of defendant FEDEX to the extent that the patterns and practices of racial discrimination and other wrongful acts alleged herein, which have been, and continue to be, perpetrated by defendant FEDEX against plaintiffs and other African American employees are, in fact, in whole or in part, the responsibility of FEDEX CORP.  FEDEX CORP does business in the San Francisco Bay Area as "FEDEX Express," "FEDEX Ground," "FEDEX Freight," "FEDEX Custom Critical," "FEDEX Services" and "FEDEX Trade Networks".

8.     Plaintiffs are informed and believe, and based thereon allege, that Defendant FEDEX is, and at all times mentioned herein was, a corporation duly organized and existing

-3-

under the laws of the State of Delaware, operating facilities, among other places, in the Northern District of California.

9.      Plaintiffs are informed and believe, and based thereon allege, that defendant CAPRIELLO is a Caucasian male, currently employed as a Senior Manager for Heavyweight operations at the Edes Facility, and was formerly the Senior Manager at the San Leandro Facility from approximately October 1999 to October 2000.  Defendant CAPRIELLO has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported, by a managerial chain of command including defendants PERRY, VANGALDER and PIGORS.

10.     Plaintiffs are informed and believe, and based thereon allege, that defendant FERREY is a Caucasian male, employed by FEDEX as the Senior Manager responsible for PM Sort Operations at the Oakland Hub since approximately October 2000.  Defendant FERREY has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported, by a managerial chain of command including defendants PERRY and PIGORS.

11.     Plaintiffs are informed and believe, and based thereon allege, that defendant HEINZ is a Caucasian male, employed by FEDEX as the District Manager for the Coastal District since approximately October 2000.  Defendant HEINZ has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported, by a managerial chain of command including defendants PERRY, WARTNER and PIGORS.

12.     Plaintiffs are informed and believe, and based thereon allege, that defendant JOHNSON is a Caucasian male, employed by FEDEX as an Operations Manager at the Sunnyvale Facility from at least 1998.  Defendant JOHNSON has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported, by a managerial chain of command including defendants MOTTER, WARTNER, SEYMOUR and PIGORS.

13.     Plaintiffs are informed and believe, and based thereon allege, that defendant MATTHEWS is a Caucasian male, employed by FEDEX as an Operations Manager of a FEDEX Facility in San Diego County, and previously employed as the Senior Station Manager at the

-4-

1    Santa Clara Facility until approximately December 2001.  Defendant MATTHEWS has been
2    promoted, and his wrongful actions against FEDEX's minority employees have been directly
3    supported, by a managerial chain of command including defendants WARTNER, SEYMOUR
4    and PIGORS.

5         14.    Plaintiffs are informed and believe, and based thereon allege, that defendant
6    MEEKS is a Caucasian male, employed by FEDEX as an Operations Manager at the Sunnyvale
7    Facility since approximately September 2000.  Defendant MEEKS has been promoted, and his
8    wrongful actions against FEDEX's minority employees have been directly supported, by a
9    managerial chain of command including defendants MOTTER, WARTNER, SEYMOUR and
10   PIGORS.

11        15.    Plaintiffs are informed and believe, and based thereon allege, that defendant
12   MONTEZ is a Caucasian male, employed by FEDEX as the Senior Manager at the San Leandro
13   Facility from approximately October 2000 to 2002.  Defendant MONTEZ has been promoted,
14   and his wrongful actions against FEDEX's minority employees of have been directly supported,
15   by a managerial chain of command including defendants VANGALDER and PIGORS.

16        16.    Plaintiffs are informed and believe, and based thereon allege, that defendant
17   MOTTER is a Caucasian male, employed by FEDEX as the Senior Station Manager at the
18   Sunnyvale Facility since approximately January 2000, as acting Senior Station Manager for the
19   Santa Clara Facility in April 2002, and formerly as an Operations Manager at the Sunnyvale
20   Station from November 1994 until January 2000.  Defendant MOTTER has been promoted, and
21   his wrongful actions against FEDEX's minority employees have been directly supported by a
22   managerial chain of command including defendants WARTNER, SEYMOUR and PIGORS.

23        17.    Plaintiffs are informed and believe, and based thereon allege, that defendant
24   PERRY is a Caucasian male, employed by FEDEX as a Senior Manager in the Bay Area Metro
25   District, and previously, until January 2002, as a Managing Director out of the Oakland Hub
26   responsible for San Jose Heavyweight Operations, the San Jose Ramp and PM Sort operation in
27   Oakland.  Defendant PERRY has been promoted, and his wrongful actions against FEDEX's
28   minority employees have been directly supported by defendant PIGORS.

-5-

18.     Plaintiffs are informed and believe, and based thereon allege, that defendant PIGORS is a Caucasian male, employed by FEDEX as the Vice President of Operations for FEDEX's Air Ground Freight Services division for the Western Region since approximately March 2000, and previously as Vice President of Operations for FEDEX's Domestic Ground Operations for the Western Region.  Defendant PIGORS has promoted and supported the wrongful actions against FEDEX's minority employees that have been taken by managers under his immediate direction, including those actions taken by defendants CAPRIELLO, HEINZ, FERREY, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, SEYMOUR, STITES, SUAZO, VAN GALDER and WARTNER.

19.     Plaintiffs are informed and believe, and based thereon allege, that defendant SEYMOUR is a Caucasian male, employed by FEDEX as District Manager for the Bay Area Metro District since mid-2000, and previously as the Senior Station Manager at the Sunnyvale Facility.  Defendant SEYMOUR has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported by a managerial chain of command including defendants WARTNER and PIGORS.

20.     Plaintiffs are informed and believe, and based thereon allege, that defendant STITES is a Caucasian male, employed by FEDEX as an Operations Manager at the Oakland Hub since approximately June 1997.  Defendant STITES has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported by a managerial chain of command including defendants PERRY, VAN GALDER and PIGORS.

21.     Plaintiffs are informed and believe, and based thereon allege, that defendant SUAZO is a Caucasian female, employed by FEDEX as the Senior Station Manager at the Santa Clara Facility since approximately April 2002.  Defendant SAUZO has been promoted, and her wrongful actions against FEDEX's minority employees have been directly supported by a managerial chain of command including defendants WARTNER, SEYMOUR and PIGORS.

22.     Plaintiffs are informed and believe, and based thereon allege, that defendant VANGALDER is a Caucasian male, employed by FEDEX as Managing Director responsible for AM Sort and Day Sort Operations, as well as Ramp Transit Drivers in the Bay Area Metro

-6-

District.  Defendant VANGALDER works out of the Oakland Hub.  Defendant VANGALDER has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported by a managerial chain of command including defendants PERRY and PIGORS.

23.     Plaintiffs are informed and believe, and based thereon allege, that defendant WARTNER is a Caucasian male, employed by FEDEX as District Manager for the Palm Desert District since mid-2000, and formerly as the District Manager for the Bay Area Metro District and as the Station Manager at the Sunnyvale Facility.  Defendant WARTNER has been promoted, and his wrongful actions against FEDEX's minority employees have been directly supported defendant PIGORS.

24.     Plaintiffs are ignorant of the true names and capacities of defendants, whether individual, corporate, associate or otherwise, sued herein as DOES 1 through 100, inclusive, and plaintiffs therefore sue such defendants by such fictitious names.  Plaintiffs are informed and believe, and based thereon allege, that each of these fictitiously named defendants is responsible in some manner for the unlawful acts, omissions, occurrences, events and happenings alleged herein and that plaintiffs' injuries as alleged herein were proximately caused by such aforementioned defendants.  When plaintiffs ascertain the true names and capacities of Doe Defendants 1 through 100, plaintiffs will seek leave of Court to amend the Complaint to set forth the true names and capacities of such defendants.

25.     Plaintiffs are informed and believe, and based thereon allege, that at all times mentioned herein, each of the defendants was and is the agent, employee and servant of each other defendant, and committed the occurrences, unlawful acts and omissions complained of herein while acting within the scope of such agency, employment and servitude.  Moreover, each of the defendants conspired and acted in concert with one another, and/or agreed to conspire and act in concert with one another to commit the unlawful and unfair acts and/or omissions alleged herein, and to violate the rights of plaintiffs.  The acts and/or omissions of defendants, and each of them, was or is in furtherance of said conspiracy and, thus, attributable to each of the other defendants.

AMENDED COMPLAINT                                        CASE NO. 04-0099 SI

## GENERAL ALLEGATIONS

26.     Defendants FEDEX CORP and FEDEX are Delaware corporations operating express mail and package delivery and freight delivery services in the San Francisco Bay Area, as well as throughout the State of California, the country and the world.  The parties to this action are, or have been, employed by defendants FEDEX CORP and FEDEX in their Domestic Ground Operations Division for the Western Region ("DGO"), or in their Air and Ground Freight Services Division for the Western Region ("AGFS").

27.     Until approximately February 2001, defendant PIGORS managed FEDEX's DGO Western Region as Vice President of Operations.  Defendant PIGORS is currently Vice President of Operations for the Western Region of FEDEX's AGFS Division, and Tom O'Heara is Vice President of Operations for the DGO Division.

28.     The Western Region of DGO is divided into several districts headed by District Managers.  The districts in California include, Bay Area Metro, Coastal (including Bakersfield), East Bay (including Oakland and Hawaii), Golden State (including Sacramento), Harbor (including Los Angeles), Palm Desert (including San Diego), and Southern California (including Orange County) Districts.

29.     In the DGO Division, the Vice President of Operations, the District Managers and Station Managers form the senior management ranks for defendants FEDEX CORP and FEDEX in a region.  The various operations managers at each facility form the lower management ranks.

30.     Defendants have limited the senior management ranks in the Western Region, as well as the lower management ranks primarily to Caucasians.  Defendants employ only a sparse number of non-Caucasians in its management ranks.  Plaintiffs are informed and believe, and based thereon allege, that defendants FEDEX CORP and FEDEX have never employed an African American or non-Caucasian as a Vice President of Operations in any Region.

31.     In the Bay Area Metro District, defendants FEDEX CORP and FEDEX currently employ a Caucasian District Manager, nine (9) Caucasian Station Managers and a single African American Station Manager.  In the Coastal District, defendants FEDEX CORP and FEDEX currently employ a Caucasian District Manager, eleven (11) Caucasian Station Managers and two

-8-

(2) minority Station Managers.  In the East Bay District, defendants FEDEX CORP and FEDEX currently employ a Caucasian District Manager, nine (9) Caucasian Station Managers and a Hawaiian Station Manager.  In the Golden State District, defendants FEDEX CORP and FEDEX currently employ an African American District Manager and approximately 13 Caucasian Station Managers.  In the Harbor District, defendants FEDEX CORP and FEDEX currently employ a Caucasian District Manager, six (6) Caucasian Station Managers and one (1) African American Station Manager.  In the Palm Desert District, defendants FEDEX CORP and FEDEX currently employ a Caucasian District Manager, and approximately ten (10) Caucasian Station Managers.  Finally, in the Southern California District, defendants FEDEX CORP and FEDEX currently employ a Caucasian District Manager, and approximately 12 Caucasian Station Managers.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

32.    Defendants have also limited the management opportunities for minority employees in lower management positions at, among other facilities, its Santa Clara and Sunnyvale Facilities where a majority of the plaintiffs working in the DGO Division are employed.  Out of the seven (7) management positions at the Santa Clara Facility, non-Caucasians occupy a total of two; and no non-Caucasian holds a senior management position at this facility.  Similarly, out of the seven (7) management positions at the Sunnyvale Facility, none are held by non-Caucasians; and only Caucasians have ever held the senior management position at this facility.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

33.    Significantly, only one percent (if that) of all defendants' management positions in the Bay Area, whether upper, middle or lower management, are filled by minorities.  As a result of the few minority managers in management positions in FEDEX's Bay Area Metro District, the managerial ranks within the District are commonly known as the "Ole Boys Network" or the "Country Club."  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

34.    FED EX's racial composition in the Bay Area facilities is grossly disproportionate

than society in general.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

35.    More specifically, defendants employ approximately 100 people at the Santa Clara Facility.  Out of such 100 employees, approximately thirty (30) are non-Caucasian, or 30%.  Similarly, defendants employ approximately 108 people at the Sunnyvale Facility.  Out of such 108 employees, approximately twenty (20) are non-Caucasian, or 18.5%.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

36.    Defendants FEDEX CORP and FEDEX operate numerous warehouse distribution centers in the districts comprising the broader Bay Area; among these are the Bakersfield Facility, the Milpitas Facility, the Oakland Facility, the Santa Clara Facility, South San Francisco Facility and the Sunnyvale Facility.  In general, the distribution facility is comprised of a large warehouse to which packages are delivered, sorted, stored for later delivery or pick-up, and shipped.  The warehouse operation revolves around a large "U"-shaped, conveyor belt, generally referred to as the Line.  A delivery vehicle, such as the typical FedEx truck involved in customer deliveries, enters the warehouse and backs up to a loading dock along either side at the beginning of the Line.  In the warehouse, Handlers unload (or load in the converse event) the packages onto the dock and place them on the Line.  Couriers typically assist in the loading and unloading of their respective trucks.  As packages are placed on the Line, their tracking numbers are scanned to input into the electronic tracking system that the packages have been received at the distribution facility.  (In cases where packages are being loaded onto a truck for further shipping or delivery, the tracking numbers are scanned to indicate they are leaving the warehouse.)  At approximately the mid-point along the length of the Line, and well inside the warehouse, the Line splits in a "T."  At that "T," packages may the diverted down a conveyor belt forming the stem of the "T," or continue along the original line.  Packages diverted down the stem of the "T" are sorted into buckets, according to destination, and prepared for customer delivery by the Facility's Couriers or held for customer pickup.  Packages that continue along the original Line are also sorted and placed in buckets in preparation for arriving at an elevated shipping bay on the opposite side of

-10-

the warehouse, where they are stacked into enormous "cans," which are room-sized plastic or metal containers that are loaded into tractor trailer trucks for ground shipment or transport to an airport.

37.  The elevated section of the line is referred to as "Topside" and is easily the most physically and mentally strenuous part of the facility operation.  Packages and buckets coming to the Topside area are typically much heavier.  Further, the Line at Topside operates faster to meet the greater time constraints.  Packages and buckets must be sorted, scanned and stacked in the cans quickly to meet the departure deadlines of the tractor-trailer trucks, which must depart promptly in order to transport freight to waiting airplanes.

38.  Defendants FEDEX CORP and FEDEX operate two shifts for facilities within the DGO Division, an A.M. shift and a P.M. shift, during which packages arrive and depart the warehouse.  On average, approximately 7,000 to 13,000 packages may be handled and sorted on the Line per hour during a shift at the Santa Clara and Sunnyvale Facilities!  And, an individual package may weigh anywhere from a few ounces to 75 pounds.  Crates may weigh up to 200 pounds.

39.  Defendants FEDEX CORP and FEDEX employ numerous Handlers to lift, sort, scan and stack packages in buckets, cans and delivery vehicles.  In addition, several of the Handlers are designated as "Lead Handler" and are responsible for the coordination and efficient operation of other Handlers in processing packages along a particular part of the Line.  The smooth efficient operation of the Line is critical to defendants FEDEX CORP and FEDEX's business and for warranties to customers that packages will reach their destination within guaranteed timeframes.  Because the Line is a single conveyor belt along which all Handlers perform their duties, a bottleneck along any of the various points may create hardship in other parts of the facility.  The efficient operation of the Line requires that sufficient numbers of Handlers be stationed at those points on the Line that are more labor intensive, whether due to the size and weight of the packages, the number of the packages being processed, or because of additional functions that must be performed (i.e. sorting, stacking in buckets or cans, etc.).

40.  In addition to Handlers, defendants FEDEX CORP and FEDEX employ other

-11-

types of job classes at their DGO facilities. These include Couriers who operate the delivery vehicles and deliver and pickup packages from customers; Shuttle Drivers who drive shuttles or large tractor trucks to pick up significant numbers of packages from institutional customers and to make trips to the airport and other distribution facilities; Customer Service Agents ("CSA") who interact with the public and handle customer pickups and complaints; Dispatchers who communicate with Couriers; Operations Managers who supervise the various workgroups or job classes in the Facility during a shift; and Station Managers who are responsible for the entire operation of a Facility.

41. As part of their AGFS Division for the Western Region, defendants FEDEX CORP and FEDEX have operations at, among other places, the Oakland Hub, the San Leandro RTD Facility, and the San Francisco and San Jose Ramp facilities. At these facilities, defendants' employees load and unload delivery packages for ground and air shipment throughout the country and around the world. Defendants also have Heavyweight operations in the AGFS Division that are responsible for transporting extremely large freight, which is not suitable for air transport, over long distances.

42. As in their DGO Division, the Vice President of Operations, the District Managers and the Senior Managers form the senior management ranks for defendants in a region. The various operations managers at each facility form the lower management ranks. In its senior management ranks in particular, defendants have limited the senior management ranks in the Western Region, as well as the lower management ranks primarily to Caucasians. Defendants have employed only a sparse number of non-Caucasians.

43. Plaintiffs are informed and believe, and based thereon allege, that defendants FEDEX CORP and FEDEX have never employed an African American or other minority as a Vice President of Operations in any Region or AGFS. The current Vice President of Operations is defendant PIGORS who is stationed in Irvine, California.

44. Three Directors based out of the Oakland Hub and are responsible for defendants' Bay Area operations. Defendant VANGALDER is one of the Directors. VANGALDER is responsible for (i) the RTD Trucking operations in the Bay Area, which stretches from Santa

AMENDED COMPLAINT                                                    CASE NO. 04-0099 SI

Cruz to Sacramento and is based out of the San Leandro Facility; (ii) all AM Sort operations (3:00 a.m. to 7:00 a.m.) at the Oakland Hub, which include sorting and delivery of all inbound packages; (iii) Day Sort operations (7:00 a.m. to 2:00 p.m.), which include local and 2-Day deliveries; (iv) Weekend Sort operations; and (v) the Hawaii Ramp Facility.

45.     A second Director at the Oakland Hub is responsible for (i)  the West Coast Overlay, which involves all packages destined anywhere in the Western Region; (ii) all PM Sort operations, which include all priority packages bound for destinations outside the West Region; and (iii) the International Sort for all international deliveries.

46.     The third Director at the Oakland Hub is responsible for operations at all the smaller Ramp Facilities.  The smaller AFGS facilities include the Edes Facility (OAKRS), Portland Ramp (PDXR), Reno Ramp (RNOR), Sacramento Ramp (SMFR), Sacramento Heavyweight (SMFRT), San Francisco Ramp (SFOR), San Jose Ramp (SJCR), San Jose Heavyweight (SJCRT), and the Seattle Ramp (SEAR).

47.     At each facility other than the Oakland Hub, there is a Senior Manager.  However, at the Oakland Hub, there are typically a few senior managers for each shift.  For example, there are two Senior Managers for the AM Sort, two Senior Managers for the Day Sort, two Senior Managers for the PM Sort, three Senior Managers for the West Coast Overlay Sort, one manager for the Weekend Sort and one manager for the International Sort.

48.     Each Senior Manager in the Western Region supervises approximately six to seven Operations Managers.

49.     At the AGFS facilities, defendants FEDEX CORP and FEDEX employ, among other positions, Cargo Handlers, Ramp Agents, Equipment Operators, and Ramp Transit Drivers in order to load and unload packages and heavy freight, to transfer the cargo to and from the cargo airplanes to the onsite facility for sorting or storage, and to transfer the cargo to and from the large freight vehicles or smaller shuttles that transport the packages to the various distribution facilities in the area or to their ultimate destinations.  In the event there are dangerous spills from packages, Defendants FEDEX CORP and FEDEX employ Hazardous Materials Specialists to contain and neutralize such occurrences to assure employee safety and that of the general public.

50.    Of the eleven Senior Managers employed by defendants at the Oakland Hub only four are non-Caucasian.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

51.    Similarly, defendants FEDEX CORP and FEDEX employ a disproportionately low number of minority and female Senior Managers at AGFS' smaller Bay Area facilities.  Of the eight Senior Manager positions, minority managers hold two positions.  Moreover, there are only two female Senior Managers employed by the AGFS Division.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

52.    FEDEX has a grossly disproportionate racial composition of society in general.  More strikingly, only one percent (if that) of defendants' management positions in the Bay Area, whether upper, middle or lower management, are filled by non-Caucasians.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

53.    Virtually all minority employees in both the DGO and AGFS Divisions of FEDEX occupy entry level, hourly positions.  The few non-Caucasian employees who are able to break into the management ranks are usually promoted by other minority managers.  However, these minority managers are usually subjected to long-standing and exclusive alienating practices that affectively minimize their influence and participation in collective management decisions, and limit their opportunities for further advancement at FEDEX.  Such practices, for example, include exclusion of minority managers from "informal" email buddy lists that are used to communicate relevant operating procedures, discuss managerial issues, and post corporate advancement opportunities.  Minority managers are also excluded from the important social activities, like retreats and ski trips organized by senior managers, where important networking takes place and relationships are developed.  In addition to the facts alleged below, such employment figures and practices demonstrate patterns and employment practices that are racially discriminatory.

54.    Defendants FEDEX CORP and FEDEX have a long-standing, widespread and deep-rooted discriminatory employment policy against hiring minority applicants in the Bay Area

-14-

if Caucasians are available.  This practice is demonstrated by the fact that defendants' workplace is grossly disproportionate to the racial composition of the San Francisco Bay Area in general. Consistent with defendants' long-standing and deeply rooted discriminatory policies, defendants will typically hire minority employees only for entry, low-level and part-time positions. Moreover, they consistently fail and refuse to promote these minority employees.

55.    Minority employees have, from time to time, referred other minority family members, friends and/or colleagues to apply for jobs with defendants FEDEX CORP and FEDEX in an effort to improve the racial composition of defendants' workforce.  However, defendants FEDEX CORP and FEDEX consistently fail and refuse to hire its employees' non-Caucasian family members, friends and/or colleagues, while regularly hiring Caucasian applicants referred to defendants by Caucasian employees.   In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

56.    Defendants FEDEX CORP and FEDEX have further engaged in related discriminatory practices to limit the employment opportunities of minorities at its facilities by means of a dual-employment track.  Under this dual-track employment scheme, defendants FEDEX CORP and FEDEX employ individuals on either a permanent full-time basis or a part-time basis for most entry-level and non-managerial jobs.  For example, both full-time and part-time employees fill Handler positions at a facility.  However, the full-time positions are necessarily more lucrative and provide employees with more opportunities for advancement in the organization, job security and greater pay and benefits.  By contrast, the part-time positions are generally less desirable, having lower total wages, changing and inconstant work hours, proportionately heavier responsibilities, and generally more oppressive work conditions.  Further, employees holding part-time positions are typically required to seek second and third jobs in order to cover the costs of living; and the changing and inconstant work hours often make it difficult for such employees to find suitable, long-term jobs for supplemental income.

57.    Defendants FEDEX CORP and FEDEX systematically and prejudicially divert qualified minority job applicants into part-time jobs, with lesser job security, compensation and opportunity for advancement.  On the other hand, defendants typically reserve the full-time,

-15-

higher wage positions for Caucasian applicants. For example, of the approximately 24 African Americans employed at the Santa Clara and Sunnyvale Facilities, approximately 18 have been tracked into the low-paying, unstable and oppressive part-time positions; that is to say, 75% of the African Americans employed by defendants are in dead-end jobs. This figure demonstrates that minority employees are grossly under-represented in the full-time jobs with greater security. In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

58. Defendants FEDEX CORP and FEDEX further use the dual-track system to mask other discriminatory practices that have a disproportionate impact on minority employees. Part-time employees are disproportionately impacted by adverse employment actions, such as lay-offs or reduced hours; notwithstanding, that many part-time employees may have more seniority over full-time employees. As previously mentioned, part-time employees have lesser opportunities for advancement with defendants. By tracking minority applicants into part-time positions, defendants have a convenient excuse to explain discriminatory practices that result in disproportionate numbers of minorities being laid off or having their hours reduced in economically hard times, or that prevent minority employees from receiving well-deserved promotions. In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

59. At its facilities, defendants FEDEX CORP and FEDEX have fraudulently instituted the practice of designating "Lead" positions (e.g. Lead Handler) to obscure its practice of limiting advancement and management opportunities to minority employees, and to justify its practice of requiring minority employees to perform more work for no additional compensation or job-level advancement. "Lead" Handlers, for example, are required to perform the exact same duties as other Handlers in their area, in addition to being responsible for supervising, training and taking measures to assure the proper and efficient functions of their work groups.

60. Defendants FEDEX CORP and FEDEX routinely hold minority Leads responsible for performance deficiencies in their group, even though they do not have the authority to make necessary adjustments to group assignments, obtain additional resources or take other measures to

-16-

address deficiencies they might identify.  When changes are required, minority Leads must rely on the discretion of management, who may or may not support them.  Defendants FEDEX CORP and FEDEX consistently deny requests for additional support from minority Leads.  By contrast, Caucasian Leads are granted broader discretion in managing their work groups and enjoy management support when they request additional resources.

61.    Defendants FEDEX CORP and FEDEX regularly reprimand and discipline minority Leads for group deficiencies even if managers have previously refused to implement corrective measures recommended by the minority Leads to address the issue.  By contrast, defendants FEDEX CORP and FEDEX rarely reprimand or discipline Caucasian Leads for similar deficiencies in their work groups.

62.    Despite significantly greater responsibility minority Leads receive the same compensation as others in their work groups.  Furthermore, for the minority Lead, the position is not a stepping-stone to a promotion.  Minority Leads are routinely passed over for promotions in favor of Caucasian employees, including Caucasian candidates who have never held quasi-management Lead positions.  By contrast, Caucasian Leads are routinely given preference for available promotions.  In fact, if a Caucasian holds the Lead position in a work group for which the operations manager position is open, the Caucasian Lead is often appointed manager without the necessity of having to interview for the position.

63.    In many instances, defendants FEDEX CORP and FEDEX disingenuously employ the practice of appointing minority employees to Lead positions, in order to create the perception of promoting minorities.  In reality, for most minority Leads, the position is without meaningful benefits, but is characterized by numerous liabilities.  For the Caucasian Lead, the position is treated more as an extension of management.  In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

64.    As described in greater detail below, numerous Caucasian employees, who have been hired subsequent to the hiring of plaintiffs at the Bay Area FEDEX Facilities, have been promoted by defendants FEDEX CORP and FEDEX to full-time, higher paying and/or management positions for which plaintiffs have applied.  Time and again, plaintiffs often have

-17-

trained and assisted such subsequently-hired Caucasian employees, only to have defendants FEDEX CORP and FEDEX subject plaintiffs to the indignity of having such subsequently-hired, Caucasians promoted to positions over them.  In many cases, plaintiffs have had continue their training of the promoted Caucasians in their new management or leadership responsibilities.  In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

65.    As described in greater detail below, defendants have engaged in a widespread, deep-rooted unfair employment practice of paying minority employees less than Caucasian employees in similar positions at the same facility, even though the minority employees may have comparable responsibilities, more seniority and/or more work experience than the Caucasian employees.  In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

66.    Defendants routinely engage in the fraudulent practice of altering time cards of minority employees in order to reduce the number of hours worked and the amount of wages to which they are entitled.  Defendants also alter the time cards of minority employees in order to deny them overtime, sick and vacation pay.  Defendants do not subject Caucasian employees to fraudulent time card practices that result in reduced wages and benefits.

67.    As described in greater detail below, defendants FEDEX CORP and FEDEX have engaged in a long-standing, widespread and discriminatory practice of applying differential standards in determining whether to subject an employee to disciplinary action.   Minority employees are consistently reprimanded and disciplined for petty matters, and are disciplined for infractions unsupported or contradicted by credible evidence.  In many cases, Minority employees are not even allowed to present their version of the facts prior to discipline; are disciplined before an investigation is complete; or are prevented from utilizing the Guaranteed Fairness Treatment Process ("GFT Process") implemented by Defendants FEDEX CORP and FEDEX to allow employees to appeal disciplinary and/or employment actions.   Not surprisingly, Caucasian employees are not reprimanded or disciplined for similar, if not identical, trivial matters, or for infractions which are not supported by credible evidence.  And, there are no incidents where a

AMENDED COMPLAINT                                                                                    CASE NO. 04-0099 SI

Caucasian employee has requested to appeal a decision through GFT Process and has been denied the opportunity.  In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

68.  Defendants FEDEX CORP and FEDEX in general, and the INDIVIDUAL DEFENDANTS in particular, have used the racially discriminatory practice of liberally and frivolously reprimanding or disciplining minority employees, for acts and in instances where defendants have not disciplined Caucasian employees, in order to provide pretext for their wrongful, race-based termination of minorities.

69.  Defendants FEDEX CORP and FEDEX inform employees that their employment with the Company will be terminated if an employee receives three (3) warning letters in a 12-month period.  In fact, company policy allows employment to be terminated if an employee receives three of any written form of discipline in a 12-month period.  Thus, in addition to a written warning letter, a documented counseling, or "OLCC," which is a verbal warning accompanied by a notation in a company database that both and employee and manager acknowledge in writing, may count towards employment termination.

70.  Defendants routinely terminate minority employees who receive three forms of discipline within a 12-month period.  By contrast, defendants do not automatically terminate Caucasian employees who are disciplined three times in a 12-month period.  In cases, where Caucasians have received three disciplinary actions in a 12-month period, defendants have allowed the Caucasian employee to continue his employment, have transferred the employee, or have demoted the employee.

71.  Defendants have engaged in the fraudulent and misleading practice of informing minority employees to disregard or forego the GFT Process for unfair OLCCs, assuring them that a GFT appeal is not worth the trouble.  Defendants fraudulently inform minority candidates that OLCCs cannot be counted towards termination decisions.  Meanwhile, defendants discipline minority employees for minor matters and terminate them on that basis.  Upon discovering later that even the minor forms of discipline may be counted in termination decisions, many minority employees are left without recourse to challenge earlier, unfair disciplinary actions that

contributed to the total of three, and which they might have appealed using the GFT Process had they been correctly informed.  Under the GFT guidelines, employees have only five days to initiate an appeal.  In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

72.    Defendants FEDEX CORP and FEDEX have further created a racially hostile workplace environment designed and intended to intimidate plaintiffs and other minority employees from complaining about the racially discriminatory practices at defendants FEDEX CORP and FEDEX's facilities for fear of losing their jobs or further increasing the oppressive and hostile work conditions.  On those occasions when plaintiffs and other minorities have complained about such racially-discriminatory practices, defendants FEDEX CORP and FEDEX have retaliated against such complaining individuals, through such acts as termination, suspension, formal disciplinary actions, and more adversely affecting such complaining individual's working conditions.  In addition to the facts alleged below, such circumstances demonstrate patterns and employment practices that are racially discriminatory.

73.    Defendants CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNER, (collectively the "INDIVIDUAL DEFENDANTS"), directly and indirectly, individually and in concert, have further engaged in a relentless pattern and practice of intentional harassment and persecution of plaintiffs and other minority employees with the intent to mentally intimidate plaintiffs and other minority employees; place them in conditions of grave physical danger; demean them; undermine their standing and authority with their colleagues; and generally force them to terminate their employments with FEDEX.  Such INDIVIDUAL DEFENDANTS have undertaken such harassing actions with malice, forethought and careful planning.

74.    The INDIVIDUAL DEFENDANTS have used their management positions with defendants FEDEX CORP and FEDEX to suppress formal complaints by plaintiffs and other minority employees.  INDIVIDUAL DEFENDANTS in higher management positions have affirmatively assisted or overlooked the harassing behavior of INDIVIDUAL DEFENDANTS under their supervision and control, and have failed to alleviate the incessant harassment and

AMENDED COMPLAINT                                                    CASE NO. 04-0099 SI

1  persecution of plaintiffs and other minority employees. In addition to the facts alleged below,

2  such circumstances demonstrate patterns and employment practices that are racially

3  discriminatory.

4      75.    Further, defendants FEDEX CORP and FEDEX have, actively and tacitly,

5  condoned the harassing behaviors of the INDIVIDUAL DEFENDANTS by failing to properly

6  investigate formal complaints regarding harassment by the INDIVIDUAL DEFENDANTS; and

7  by promoting the INDIVIDUAL DEFENDANTS or transferring them among their various

8  locations despite repeated complaints (and in some cases, previous discrimination lawsuits) made

9  by plaintiffs and other minority employees. In addition to the facts alleged below, such

10  circumstances demonstrate patterns and employment practices that are racially discriminatory.

11     76.    As a proximate result of the above-described long-standing, widespread and deep-

12  rooted racially-discriminatory employment practices and other wrongful acts alleged herein,

13  plaintiffs, and each of them, have suffered loss of income, loss of advancement and promotion,

14  loss of career opportunity, loss of intangible job benefits, all in amounts to be proven at trial. As

15  further proximate result of the above-described racially discriminatory employment practices and

16  other wrongful acts alleged herein, plaintiffs, and each of them, have experienced pain, suffering,

17  severe emotional and mental distress, shame, humiliation, embarrassment, and related physical

18  ailments all in amounts to be proven at trial.

19     77.    The long-standing, wide-spread and deep-rooted racially-discriminatory

20  employment practices and other wrongful acts alleged herein are oppressive, malicious,

21  fraudulent and in conscious disregard of plaintiffs' human and civil rights such that punitive

22  damages are warranted in order to punish and make an example of all defendants.

23     78.    Plaintiffs, and each of them, have experienced such racially-discriminatory

24  employment practices and other racially-discriminatory actions by defendants including, without

25  limitation, practices and actions in the following respects:

26                        **ALEXANDER RIVERA**

27     79.    Defendant FEDEX hired plaintiff RIVERA in approximately June 1997 as a

28  Courier at the Sunnyvale Facility. Defendants engaged in widespread, deep-rooted racially

-21-

AMENDED COMPLAINT                          CASE NO. 04-0099 SI

discriminatory employment practices of assigning plaintiff and other non-Caucasian Couriers the most difficult delivery routes in terms of both distance and number of packages to be delivered. Plaintiff RIVERA's route required plaintiff to pick up nearly twice as much freight as the average Courier with a heavy route. The average Courier with a heavy freight route was required to pick up approximately 250 packages; whereas, plaintiff was required to pick up approximately 400 to 600 packages on an average day. Moreover, despite repeated requests by plaintiff, defendants refused to provide plaintiff with necessary assistance on occasions when plaintiff's deliveries were particularly heavy. By contrast, defendants routinely provided delivery assistance to Caucasian Couriers when they requested assistance even though the Caucasian Couriers were assigned shorter and less demanding delivery routes.

80.     In addition, defendants, and particularly defendant MOTTER, harassed plaintiff by setting work objectives that were impracticable, if not impossible, for plaintiff to meet. Defendant MOTTER insisted that plaintiff perform his greater duties and return to the station within the same time frame as Caucasian Couriers with easier routes. Defendants imposed such unrealistic demands on plaintiff to harass and set plaintiff up for disciplinary action and failure. Defendants ignored plaintiff's complaints that he could not complete his route in the specified timeframe without leaving packages scheduled for pick up. When plaintiff failed to complete his route within the unreasonable time frame he was reprimanded and disciplined by defendants.

81.     Defendants further harassed plaintiff by constantly scrutinizing and criticizing his job performance. Defendants did not scrutinize Caucasian Couriers' performance. If Caucasian Couriers returned to the station late from their routes, they were not verbally reprimanded or criticized in front of their peers like defendants reprimanded or criticized plaintiff. Furthermore, plaintiff was criticized if he inadvertently made a mistake in preparing an air bill. Caucasian Couriers were not similarly criticized or disciplined for inadvertent air bill mistakes.

82.     Defendants have engaged in a widespread, deep-rooted racially discriminatory employment practice of paying plaintiff RIVERA and other minority employees less than they pay Caucasian employees even though plaintiff and other minority employees have comparable responsibilities and more seniority and work experience.

-22-

AMENDED COMPLAINT                                                CASE NO. 04-0099 SI

83.     Defendants have further engaged in the racially discriminatory practice of altering plaintiff's time cards so as to short plaintiff for hours he has actually worked.  Plaintiff has repeatedly complained of these practices to defendants, including defendant's human resources department.  Defendants have failed to pay plaintiff for hours he has been shorted.

84.     Defendants also pursued their deliberate, malicious, widely used scheme of consistently issuing formal disciplinary actions against plaintiff RIVERA and other non-Caucasian employees for petty or trivial matters, or matters unsupported or contradicted by credible evidence in order to reach the three-in-a-year disciplinary actions required for an automatic termination.

85.     In late 2000, plaintiff was given a written disciplinary letter for failure to bring his printer in for inspection for a whole week.  This disciplinary action was based on a procedure implemented by MOTTER that required Couriers to turn in their equipment for regular inspection.  During the week in question, plaintiff had been on vacation the entire week and had left his printer in his truck.  Defendants insisted on disciplining plaintiff even though he was on vacation and had not been using the printer, and despite the fact that he turned the printer in for inspection immediately upon his return from vacation.  By contrast, defendants have never written up a Caucasian Courier for leaving their equipment in their trucks under similar circumstances.

86.     Defendant MOTTER also gave plaintiff RIVERA a written letter for driving a FEDEX truck with an expired commercial license.  Prior to the disciplinary action, two managers, Corey Waiters and Kenny Roberts, informed plaintiff that he did not need to have a commercial license to drive the type of Grumman truck to which he was assigned.  Though plaintiff intended to renew his commercial license, he continued to drive the truck after the expiration.  Notwithstanding the representations by the two managers, MOTTER insisted on giving plaintiff a written warning letter.  By contrast, Caucasian Couriers have been accommodated, and not disciplined, during periods between the expiration and renewal of their commercial licenses.  In fact, defendants refused to discipline one Caucasian Courier, Jay Sermino, even though he drove his FEDEX truck for months after his commercial license had expired.  In addition to giving

-23-

plaintiff a written warning, MOTTER also threatened to suspend plaintiff for allowing the license to expire in the first instance.

87.    In August 2001, plaintiff was wrongfully terminated when MOTTER instructed that plaintiff be given his third disciplinary letter in a 12-month period.  Plaintiff was written up for being late to work.  Prior to the written letter, plaintiff had not been disciplined for tardiness. Significantly, no Caucasian Courier had been given any discipline for tardiness during the period that plaintiff was employed by defendants.

**GARY WHITE**

88.    Plaintiff WHITE was hired by defendant FEDEX on or about November 30, 1994 as a casual part-time Handler at the Sunnyvale Facility.  Despite repeated requests for an available permanent position, defendants hired and/or converted many non-African American individuals, who applied for positions with defendants after plaintiff WHITE, to permanent positions before defendants gave plaintiff a permanent position.

89.    From approximately mid-1996 until sometime in 1999, defendants assigned plaintiff the additional duties of shuttle driver.  Plaintiff was required to "pre-trip" his shuttle, load and unload the shuttle, and drive the shuttle to and from the San Jose airport and to local corporate customers such as Cisco Systems and Bay Networks in Sunnyvale.  Plaintiff spent a significant part of each day performing these shuttle driving duties.

90.    Despite working primarily as a Shuttle Driver, defendants repeatedly passed over plaintiff WHITE, and other African American employees, for promotion to the position of Shuttle Driver in favor of Caucasian employees and new hire applicants with less experience and seniority.  In addition, defendants discriminated against plaintiff by failing to comply with their own personnel guidelines that require promotion to Shuttle Driver if more than 50% of an employee's time is spent driving.  Plaintiff spent more than 50% of his day performing shuttle related duties.  And, defendants refused to pay plaintiff the same compensation for driving the shuttle that defendants gave to Caucasian workers who drove shuttles.

91.    Plaintiff WHITE complained to defendants that they were treating him and other Caucasian employees who drove shuttles in a racially discriminatory manner.  When defendants

-24-

1   still refused to increase wages for plaintiffs and other African Americans drives, plaintiff initiated

2   a GFT Process in order to get compensation for his shuttle driving duties.

3       92.    Despite repeated requests by plaintiff for defendants to end his driving duties if he

4   were not paid more, defendant MOTTER refused to relieve plaintiff of shuttle driving

5   responsibilities.  Further, defendants retaliated against plaintiff for his discrimination complaint

6   and for initiating the GFT Process on the shuttle driver pay matter.  Defendants engaged in a wide

7   range of intimidation and coercive tactics to assure that plaintiff continued to drive the shuttle.

8       93.    Defendants only relieved plaintiff of his shuttle driving duties after receiving a

9   physician's note restricting plaintiff from driving shuttles until further notice.  Plaintiff had begun

10  consulting a doctor as a result of experiencing shame, humiliation, emotional distress,

11  embarrassment, and related physical ailments from defendants' racially discriminatory

12  employment practices, retaliation and harassment.

13      94.    After the doctor's restriction, defendant MOTTER and other defendants increased

14  their racially motivated retaliatory and harassment tactics. Among other things, defendants

15  severely and unfairly lowered plaintiff's performance reviews.  Previously, plaintiff's managers

16  had consistently given him 6s on the 7.0 review scale and praised plaintiff's work practices both

17  verbally and in writing.  Defendant MOTTER limited plaintiff to scores well below 6.0 and

18  openly criticized managers, in plaintiff's presence, for commenting favorably on plaintiff's work.

19  By illustration, on one occasion when plaintiff's direct supervisor was prepared to give plaintiff a

20  7.0 for attendance, defendant MOTTER preventing him from doing so.  Defendants evaluated

21  plaintiff's attendance performance as 6.0, even though plaintiff had never, ever, missed or even

22  been late for a day of work during his entire employment by FEDEX.

23      95.    In approximately November 2000, as further retaliation against plaintiff WHITE,

24  Defendant MOTTER directed defendant MEEK, who had become plaintiff's Operations

25  Manager, to reduce plaintiff's 17½ weekly work schedule by 7 to 10 hours, despite FEDEX's

26  guarantee to part-time employees of at least 17½ hours unless they waive their rights to the entire

27  minimum.  Defendants reduced plaintiff's hours and refused to pay him for the minimum in spite

28  of plaintiff's refusal to waive such rights.  On the other hand, defendants did not reduce the

guaranteed minimum of hours for Caucasian employees. They did so with plaintiff to force him to quit.

96.    Defendants also engaged in the racially discriminatory practice of altering plaintiff's time cards so as to short plaintiff for hours she has actually worked. Plaintiff has repeatedly complained of these practices to defendants, including defendant's human resources department. Defendants have failed to pay plaintiff for hours she has been shorted.

97.    Defendants also harassed plaintiff by repeatedly calling him into the office to complain of sorting errors in placing freight on trucks in instances where others also placed packages in the respective trucks. Plaintiff is informed and believe, and thereon alleges, that defendant MEEK, himself, placed wrong packages in trucks that plaintiff was working on to create grounds for additional discipline. Due to the thousands of packages that passed through the Sunnyvale Facility daily, the insufficient staffing and the rate at which packages come off the conveyor belt, the incidences of mis-sorting freight were common. Defendants rarely complained of Caucasian employees for sorting mistakes.

98.    Defendants reluctantly gave plaintiff time off for doctor's visits; whereas, Caucasian employees had no difficulty getting time off. In addition, plaintiff was required to maintain records of management's authorizations of his time off, since defendants, upon plaintiff's return, would often question whether his time off had been legitimate. Defendants routinely denied that they had given time off, and would have disciplined him had he not kept their written authorizations.

99.    To further harass and oppress plaintiff WHITE, defendants assigned him to an unnecessary, newly created position at the busiest section near the "T" of the Line, and required plaintiff to work the station alone. Employees referred to the station as the "wrongful exodus station." Even though the station was among the most difficult in the Sunnyvale Facility, defendants MEEK and MOTTER refused to let other Handlers voluntarily assist plaintiff. They also laughed at plaintiff's repeated pleas for assistance. Defendants required plaintiff to perform every task related to working the station, including lifting heavy packages from the line, scanning them and jumping up into a truck and stacking the packages for delivery. Since the station was

-26-

located in one of the busiest parts of the Line, the packages came quickly off the line. Defendants typically staff stations and cans comparable to plaintiff's new, "personal" station with at least three Handlers. Defendants did not assign Caucasian Handlers to this station, nor did they require Caucasians to work alone at any other station or can in the Facility. In addition, defendants promptly responded to requests for additional assistance coming from Caucasian employees; whereas, they denied plaintiff any help at all. On occasion, defendant MEEK himself would work the line to assist Caucasian employees. On those occasions that plaintiff requested his help with particularly heavy boxes or when the Line was moving too quickly, defendant MEEK would glare at him and tell him that he would never get any help.

100.    On January 30, 2001, plaintiff received a verbal warning from defendants for failure to scan packages at the "wrongful exodus station," The next day, January 31, 2001, defendant MEEK gave plaintiff a documented counseling also for failing to scan packages. On February 6, 2001, defendants gave plaintiff a warning letter, stating that he had failed to follow management's instructions to scan packages on 2/1, 2/2 and 2/5. Finally, on February 9, 2001, plaintiff was given another warning letter for failing to scan freight and suspended for four days.

101.    Plaintiff did not fail to follow management's instructions with regard to scanning packages at his station. Plaintiff did scan packages. However, as part of defendants' widespread, deep-rooted, racially discriminatory practices with the intent to force plaintiff to quit or provide grounds for termination, defendants artificially, needlessly, and maliciously created circumstances wherein it was impossible for plaintiff to scan all the packages that needed to be stacked. Plaintiff's failure to scan all the packages in the station was not the result of lack of training or insubordination. Plaintiff was limited by constraints created by defendants. Defendants forced plaintiff to work alone at a station that would otherwise have been worked by at least two or three handlers. Defendants refused plaintiff assistance despite repeated requests by plaintiff and voluntarily offers of help from plaintiff's colleagues. Further, plaintiff had to get packages off the Line to avoid creating a bottleneck or hardship at stations further down the Line. He also had to have packages stacked in a truck and ready for transport by the time the tractor-trailer trucks were scheduled to leave. Caught between the rock and the hard place, plaintiff

AMENDED COMPLAINT                                              CASE NO. 04-0099 SI

scanned as many packages as he could.

102.     No Caucasian Handler was ever placed in conditions as near impossible as those of plaintiff; however, defendants used the same "wrongful exodus can" to harass, demoralize and create grounds of termination for other African American Handlers.  Not surprisingly shortly after plaintiffs WHITE was terminated, defendants discontinued use of the "wrongful exodus can."

103.     Plaintiff WHITE initiated a GFT Process appeal on his two documented disciplinary actions relating to scanning.  Defendants summarily denied the appeals.

104.     Defendants succeeded in terminating plaintiff WHITE's employment on March 9, 2001.  Plaintiff was given a third warning letter in 12 months and terminated.  Defendants issued the final warning letter because plaintiff refused to stop using the section of his timecard, intended for employees to record any comments they might have and entitled "Notes," for making complaints regarding defendants' discriminatory behavior and harassment.  Defendants had instructed plaintiff not to write on the timecard; however, defendants had refused to address any of his repeated concerns of racial discrimination.  Plaintiff wrote his comments as a last and desperate effort to get defendants FEDEX CORP and FEDEX to take adequate measures to stop defendants wide-spread, deep-rooted racially-discriminatory behavior.  Significantly, defendants have never disciplined Caucasian employees who have written in the Notes section on the timecard.

## FIRST COUNT

## RACIAL DISCRIMINATION

## IN VIOLATION OF 42 U.S.C. § 1981

## AGAINST DEFENDANTS FEDEX CORP AND FEDEX EXPRESS

105.     Plaintiff incorporates by reference the factual allegations of paragraphs 1 through 104 above.

106.     Defendants, through their agents and employees engaged in a pattern and practice of unlawful racial discrimination in violation of 42 U.S.C. § 1981 in connection with the terms and conditions of Plaintiffs' employment.

-28-

AMENDED COMPLAINT                                              CASE NO. 04-0099 SI

107.    At all relevant times, defendants had actual and constructive knowledge of the discriminatory conduct described and alleged herein, and condoned, ratified and participated in the discrimination.  As a result of the hostile and offensive work environment perpetrated and maintained by defendants, and defendants' failure to protect plaintiff from further discrimination, plaintiff suffered severe emotional distress.

108.    Plaintiff is informed and believes and thereon alleges that in addition to the practices enumerated above, defendants, and each of them, have engaged in other discriminatory practices against plaintiff, which are not yet fully known.  At such time as said discriminatory practices become known to plaintiff, plaintiff will seek leave of court to amend this complaint in those regards.

109.    As a direct and proximate result of the willful, knowing, and intentional discrimination against plaintiff, and the failure to act by defendants, plaintiff has suffered mental distress, anguish, and indignation.  Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

110.    Defendants' acts alleged herein are malicious, oppressive, despicable, and in conscious disregard of plaintiff's rights.  As such, punitive damages are warranted against defendants in order to punish and make an example of their actions.

## SECOND COUNT

### RACIAL DISCRIMINATION BASED ON DISPARATE TREATMENT
**(California Fair Employment and Housing Act, Gov't Code Section 12940)**
**(Defendants FEDEX CORP and FEDEX)**

As and for their Second Count for Racial Discrimination based on disparate treatment against defendants FEDEX CORP and FEDEX, all plaintiffs, and each of them, allege as follows:

111.    As a result of such discriminatory practices and other wrongful conduct, plaintiffs have submitted claims to the California Department of Fair Employment and Housing, requesting therein a Right To Sue letter.  Plaintiffs have timely received such Right To Sue letters, thereby

permitting them to timely file and properly prosecute the present action.

112.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 111, above, as though fully set forth herein.

113.     As alleged in greater detail above, defendants FEDEX CORP and FEDEX have engaged in a consistent and on-going pattern and practice of widespread racial discrimination against employees belonging to such racial and ethnic minority groups as African American, Mexican American, Pacific Islander and Middle Eastern.  Such pattern and practice of racial discrimination includes, without limitation, the following:

A.     Caucasian employees are promoted and receive pay increases upon demonstrating good management skills; whereas, minority employees routinely suffer the indignity of being passed over for promotions in favor of Caucasian employees with less seniority and ability;

B.     Minority employees are provided with insufficient or less training than that provided to Caucasian employees in order to limit promotion and other advancement opportunities, or in order to set minority employees up for failure;

C.     Minority employees are paid less than Caucasian employees even though minority have comparable responsibilities and more seniority and experience;

D.     Minority employees are assigned more onerous tasks and greater work responsibilities than Caucasian employees;

E.     Minority employees experience difficulty in obtaining additional help in performing their duties; while Caucasian employees are routinely granted extra help;

F.     Minority employees are not permitted to "congregate" during breaks due to a racist fear of "gangs" by defendants; whereas, Caucasian employees are freely permitted to congregate;

G.     Minority employees are subjected to formal disciplinary actions for petty

or trivial matters, or matters unsupported or contradicted by credible evidence; whereas, Caucasian employees are not subjected to disciplinary actions for engaging in similar or identical behavior;

H.    Minority employees are limited, and at times denied, use of defendants' Guaranteed Fair Treatment Process; while Caucasian employees are guaranteed full rights of appeal;

I.    Caucasian employees are permitted longer breaks than minority employees;

J.    Minority employees are reprimanded if they take short respites from work to catch their breath, or extend their breaks even slightly longer than allowed, whereas, Caucasian employees are not reprimanded for taking respites or taking much longer breaks than allowed;

K.    Minority employees are reluctantly granted time off for doctor's visits, sickness or vacations, or pregnancy and disability leaves; whereas, Caucasian employees have no difficulty getting time off;

L.    Caucasian employees are provided with work accommodations for pregnancies, temporary physical disabilities and workplace injuries, while such work accommodations are denied to minority employees, even when requests for accommodation are made at the direction of physicians; and

M.    Minority employees experience unfair reduction of wages or delays in payments from defendants; whereas, Caucasian, often with less seniority, are paid promptly.

114.    The California Fair Employment and Housing Act ("FEHA"), Government Code section 12940, prohibits such racially discriminatory practices. Such racially discriminatory practices by defendants FEDEX CORP and FEDEX represent blatant, widespread, deep-rooted and unconscionable violations of FEHA.

115.    As a proximate result of such violations of FEHA, plaintiffs, and each of them,

AMENDED COMPLAINT                                                    CASE NO. 04-0099 SI

have suffered loss of income, loss of advancement and promotion, loss of career opportunity and loss of intangible job benefits, all in amounts to be proven at trial.

116.    As further proximate result of the above-described widespread, deep-rooted and unconscionable racially discriminatory employment practices, plaintiffs, and each of them, have experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment, and related physical ailments all in amounts to be proven at trial.

117.    Defendants FEDEX CORP and FEDEX's blatant, widespread and deep-rooted violations of FEHA and racially discriminatory acts alleged herein are oppressive, malicious, fraudulent, despicable, and in conscious disregard of plaintiffs' human and civil rights.  As such, punitive damages are warranted against defendants FEDEX CORP and FEDEX in order to punish and make an example of defendants FEDEX CORP and FEDEX.

### THIRD COUNT

### RACIAL DISCRIMINATION BASED ON DISPARATE IMPACT

**(California Fair Employment and Housing Act, Gov't Code Section 12940)**
**(Defendants FEDEX CORP and FEDEX)**

As and for their Third Count for Racial Discrimination based on disparate impact against defendants FEDEX CORP and FEDEX, all plaintiffs, and each of them, allege as follows:

118.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 117, above, as though fully set forth herein.

119.    Defendants FEDEX CORP and FEDEX have a specific employment practice whereby they select certain job applicants for open positions, or determine whether certain job applicants will be eligible for full-time or part-time positions.  Similarly, defendants FEDEX CORP and FEDEX have a specific employment practice whereby they select for consideration and appoint individual employees to supervisory and managerial positions.  In the each of the foregoing selection processes, defendants FEDEX CORP and FEDEX apply selection criteria, which are neither disclosed nor communicated to defendant FEDEX CORP and FEDEX's

-32-

minority applicants or employees, including without limitation those applicants and employees who are racially or ethnically characterized as African American, Mexican American, Pacific Islander or Middle Eastern.

120.    The application of such employment practice, criteria and discretion has a grossly disparate impact on the above-reference minority groups.  Through the application of such practices, plaintiffs have not been hired to more lucrative and secure, full-time positions, nor have they been promoted or even considered for promotion, notwithstanding the fact that certain plaintiffs have superior length of service with defendants FEDEX CORP and FEDEX and greater experience as employees; notwithstanding the fact that plaintiffs are qualified for promotion; notwithstanding the fact that less qualified Caucasians with less experience and seniority have been promoted; and notwithstanding the fact that plaintiffs have trained many of those Caucasian employees that have been promoted.

121.    As a result of the application of such racially-discriminatory employment practices of selecting employees for full-time jobs or for promotion without disclosing or communicating the criteria for such jobs or promotions, and in the sole discretion of defendants FEDEX CORP and FEDEX, there are embarrassingly few minority employees occupying managerial positions at defendants FEDEX CORP and FEDEX's facilities in the Western Region and in San Francisco Bay Area.

122.    As a result of such grossly disparate impact of such employment practice, the management at the Western Region and the San Francisco Bay Area facilities are commonly referred to as the "Ole Boys Network" or the "Country Club."

123.    As a proximate result of such violations of FEHA, plaintiffs, and each of them, have suffered loss of income, loss of advancement and promotion, loss of career opportunity and loss of intangible job benefits, all in amounts to be proven at trial.

124.    As further proximate result of the above-described widespread, deep-rooted and unconscionable racially discriminatory employment practices, plaintiffs, and each of them, have experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment, and related physical ailments all in amounts to be proven at trial.

-33-

125.   The grossly disparate impact of defendants FEDEX CORP and FEDEX's employment practices constitute blatant, widespread and deep-rooted violations of FEHA, and racially discriminatory acts alleged herein are oppressive, malicious, fraudulent, despicable and in conscious disregard of plaintiffs' human and civil rights.   As such, punitive damages are warranted against defendants FEDEX CORP and FEDEX in order to punish and make an example of defendants FEDEX CORP and FEDEX.

## FOURTH COUNT

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Defendants FEDEX CORP and FEDEX)

As and for their Fourth Count for Wrongful Termination In Violation Of Public Policy against defendants FEDEX CORP and FEDEX, plaintiffs RIVERA, and WHITE alone, and each of them, allege as follows:

126.   Plaintiffs RIVERA and WHITE incorporate by reference the allegations of paragraphs 1 through 125, above, as though fully set forth herein.

127.   Defendants FEDEX CORP and FEDEX actively engage in widespread and deep-rooted, racially discriminatory employment practices, including termination of minority employees based on their race, ethnicity and on criteria different than those imposed on Caucasian employees.

128.   Concurrently, defendants have craftily devised and pursued an equally widespread and racially discriminatory practice of reprimanding and disciplining minority employees for petty and trivial matters, or for matters unsupported or contradicted by credible evidence in order to develop seemingly legitimate bases for their wrongful termination actions.   And, defendants reinforce their disciplinary practices, with their unequal and unfair impact on minority employees, by limiting or preventing employees' access to defendants' Guaranteed Fairness Treatment Process to appeal such disciplinary actions.

129.   With respect to plaintiff RIVERA, defendant FEDEX CORP and FEDEX issued plaintiff RIVERA a third documented disciplinary action within a 12-month period and immediately terminated his employment in August 2001.  Plaintiff was written up for being late

AMENDED COMPLAINT                                                              CASE NO. 04-0099 SI

to work.  Prior to the written letter, plaintiff had not been disciplined for tardiness.  Moreover, no Caucasian Courier had been given any discipline for tardiness during the period that defendants employed plaintiff, and no Caucasian had ever been terminated for tardiness.

130.   Furthermore, each of the two previous warning letters in plaintiff RIVERA's file during the 12-month period was for a trivial matter.  In late 2000, plaintiff was given a written disciplinary letter for leaving his printer in his truck and failing to have it inspected during the week of his vacation.  Defendants have never written up a Caucasian Courier for leaving their equipment in their trucks under similar circumstances.  Equally discriminatory, defendants gave plaintiff RIVERA a written letter for driving a FEDEX truck with an expired commercial license, even though the type of truck he drove did not require a commercial license.  Moreover, defendants have accommodated Caucasian Couriers during periods between the expiration and renewal of their commercial licenses, and have not given them warning letters.

131.   With respect to plaintiff WHITE, defendant FEDEX CORP and FEDEX issued plaintiff WHITE a third documented disciplinary action within a 12-month period and immediately terminated his employment.  Plaintiff WHITE was issued a warning letter by defendants MEEK and MOTTER ostensibly for failing to follow management directives in continuing to write comments on the back of his personal time card in the section entitled "Notes."  Such action was taken because of plaintiff WHITE's race since Caucasian employees are not issued warning letters or fired for writing comments in the section of their personal time cards for notes, or for any other such trivial matters.

132.   Furthermore, each of the two previous warning letters in plaintiff WHITE's file during the 12-month period were for failure to scan freight, an action for which Caucasian Handlers receive no disciplinary action.  Moreover, Caucasians, who did fail to scan freight, do so in more favorable circumstances, not in the harassing circumstances under which plaintiff WHITE worked.  Plaintiff WHITE was placed in an unnecessary, newly created position where he was required to quickly take packages off the conveyor belt at a busy part of the line, scan them, jump up into a truck and stack them for delivery—and to do it all alone!  Two to three Handlers staff similar stations along the line.  No Caucasian employee has ever been forced to

-35-

work a can <u>alone</u> under the conditions suffered by plaintiff WHITE.

133. The public policy of the State of California prohibits discrimination and the denial of employment to any person based, *inter alia,* on that person's race or ethnicity. Such public policy is expressed in the California Fair Employment and Housing Act, Government Code section 12900, *et seq*. and in the California Constitution, Article I, Section 8.

134. Defendants FEDEX CORP and FEDEX's actions in terminating plaintiffs RIVERA, WHITE violated the public policy of the State of California.

135. As a proximate result of such violations of FEHA, plaintiffs RIVERA, WHITE, and each of them, have suffered loss of income, loss of advancement and promotion, loss of career opportunity and loss of intangible job benefits, all in amounts to be proven at trial.

136. As further proximate result of the above-described unconscionable and racially discriminatory employment terminations, plaintiffs RIVERA and WHITE, and each of them, have experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment, and related physical ailments all in amounts to be proven at trial.

137. The racially discriminatory conduct alleged herein was and is malicious, oppressive, fraudulent, despicable, and in conscious disregard of plaintiffs RIVERA and WHITE's human and civil rights. As such, punitive damages are warranted against defendants FEDEX CORP and FEDEX in order to punish and make an example of defendants FEDEX CORP and FEDEX.

## FIFTH COUNT

## RETALIATION

**(California Fair Employment and Housing Act, Gov't Code Section 12940(f))**
**(All Defendants)**

As and for their Fifth Count for Retaliation against defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK, plaintiff WHITE alone, and each of them, alleges as follows:

138. Plaintiff WHITE incorporate by reference the allegations of paragraphs 1 through 137, above, as though fully set forth herein.

AMENDED COMPLAINT                                    CASE NO. 04-0099 SI

139.   Plaintiff WHITE objected to the racially-discriminatory treatment alleged herein, including without limitation the following:

A.   Objections to the constant and unrelenting harassment of minority employees by defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK;

B.   Objections to the creation of hostile and unsafe work environments for minority employees by defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK;

C.   Objections to failures by defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK to make reasonable accommodations for minority employees with physical disabilities and/or workplace injuries or important family obligations;

D.   Objections to yelling, taunting, disrespectful behavior and infliction of emotional distress by defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK;

E.   Objections to failures by defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK to promote minority employees to higher paying or management positions in favor of less experienced and lower

-37-

performing Caucasian employees; and

F.   Objections to repeated issuances by defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK of documented counseling sessions and warning letters to minority employees for petty and trivial matters, or matters unsupported or contradicted by credible evidence.

140.   In retaliation for objecting to such unlawful conduct in violation of FEHA, defendants FEDEX CORP and FEDEX, acting through their managerial personnel, defendants, FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK, retaliated against plaintiff WHITE by assigning him to less desirable, and more taxing and physically dangerous work details, by taunting them and undermining their ability to perform their responsibilities, and by repeatedly and unfairly disciplining them for trivial or imagined offenses.

141.   As to plaintiff WHITE, defendants retaliated against plaintiff WHITE for claims of racial discrimination in failing to pay him for shuttle driving services, consistent with defendants' payments to Caucasian plaintiffs with similar duties.   In response to plaintiff's complaint, defendants severely and unfairly lowered plaintiff's performance reviews.   Defendant MOTTER further directed defendant MEEK to reduce plaintiff's 17½ weekly work schedule by 7 to 10 hours.  Defendants also harassed plaintiff by repeatedly calling him into the office to complain of sorting errors in placing freight on trucks, in instances where others also placed packages in the respective trucks.   The most egregious act, however, was defendants' creation of a new station at one of the busiest parts of the line, which plaintiff WHITE was required to work alone.   And though the can was among the most difficult at Topside, defendants MEEK and MOTTER refused to let other Handlers voluntarily assist plaintiff; and they laughed at his repeated pleas for assistance.   Plaintiff was ultimately terminated because of the impossibility of performing all of the required tasks at the "wrongful exodus can."

-38-

142.    Such retaliation for objecting to unlawful racial discrimination is itself a violation of FEHA.

143.    As a proximate result of such violations of FEHA, plaintiff WHITE, and each of them, have suffered loss of income, loss of advancement and promotion, loss of career opportunity and loss of intangible job benefits, all in amounts to be proven at trial.

144.    As further proximate result of the above-described retaliatory conduct, plaintiff WHITE, and each of them, have experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment, and related physical ailments all in amounts to be proven at trial.

145.    The retaliatory conduct alleged herein is and was malicious, oppressive, fraudulent, despicable, and in conscious disregard of plaintiffs WHITE's human and civil rights. As such, punitive damages are warranted against defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK in order to punish and make an example of defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK.

## SIXTH COUNT

## RACIAL HARASSMENT

**(California Fair Employment and Housing Act, Gov't Code Section 12940)**
**(All Defendants)**

As and for their Sixth Count for Racial Harassment against defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK, all plaintiffs, and each of them, allege as follows:

146.    Plaintiffs, and each of them, incorporate by reference the allegations of paragraphs 1 through 145, above, as though fully set forth herein.

147.    As alleged in greater detail above, defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER,

-39-

PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK have harassed plaintiffs on account of their race including, without limitation, in the following respects:

    A.    Assigning plaintiffs the most difficult, if not impossible tasks; providing them with minimal, if any, support; and reprimanding plaintiffs for occasionally resting from the grueling work conditions in which they were forced to work;

    B.    Subjecting plaintiffs to widespread, deep-rooted and unconscionable racially discriminatory employment practices, with the intent of inducing pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment and related physical manifestations;

    C.    Routinely taking disciplinary actions against plaintiffs for petty and trivial matters, and for infractions unsupported or contradicted by credible evidence;

    D.    Failing to provide plaintiffs with work accommodations for temporary physical disabilities and workplace injuries;

    E.    Preventing plaintiffs from "congregating" during breaks or other periods of recess;

    F.    Screaming at and taunting plaintiffs with menacing gestures like jabbing fingers within inches of plaintiffs' bodies, and uttering insults like "stupid" and "lazy;"

    G.    Delaying paychecks and corporate gifts, shorting plaintiffs on hours worked, and/or reducing their guaranteed minimum hours; and

    H.    Issuing plaintiffs and other minority employees poor or defective equipment.

148.    As a proximate result of such violations of FEHA, plaintiffs, and each of them, have suffered loss of income, loss of advancement and promotion, loss of career opportunity and loss of intangible job benefits, all in amounts to be proven at trial.

-40-

149.     As further proximate result of the above-described harassing conduct, plaintiffs, and each of them, have experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment, and related physical ailments all in amounts to be proven at trial.

150.     The harassing conduct alleged herein is and was malicious, oppressive, fraudulent, despicable, and in conscious disregard of each of the plaintiffs' human and civil rights.  As such, punitive damages are warranted against defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, JOHNSON, HEINZ, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK in order to punish and make an example of defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK.

## SEVENTH COUNT

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (All Defendants)

As and for their Seventh Count for Intentional Infliction of Emotional Distress against defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK, all plaintiffs, and each of them, allege as follows:

151.     Plaintiffs, and each of them, incorporate by reference the allegations of paragraphs 1 through 150, above, as though fully set forth herein.

152.     The above-described actions of defendants are extreme and outrageous and were undertaken with the intent to cause plaintiffs severe emotional distress.

153.     Such extreme and outrageous acts did in fact cause plaintiffs severe emotional distress.

154.     As a proximate result of such extreme and outrageous acts, plaintiffs have experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment, and related physical ailments.

155.    As further proximate result of such conduct, plaintiffs have suffered loss of income, loss of advancement and promotion, loss of career opportunity and loss of intangible job benefits, all in amounts to be proven at trial.

156.    Defendant's acts alleged herein are malicious, oppressive, fraudulent, despicable, and in conscious disregard of each of the plaintiffs' human and civil rights.  As such, punitive damages are warranted against defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK in order to punish and make an example of defendants FEDEX CORP, FEDEX, CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK.

## EIGHTH COUNT

### FRAUD

**(Defendants CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK)**

As and for their Eighth Count against defendants CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK (collectively the "INDIVIDUAL DEFENDANTS"), all plaintiffs, and each of them, allege as follows:

157.    Plaintiffs, and each of them, incorporate by reference the allegations of paragraphs 1 through 156, above, as though fully set forth herein.

158.    The INDIVIDUAL DEFENDANTS held themselves out as viable, trustworthy managers who, at all times, were confident of the representations that they made to defendants. In reality, however, the INDIVIDUAL DEFENDANTS made numerous misrepresentation of material fact, including the following:

A.    At various time more specifically set forth above, defendants JOHNSON, MEEK, MOTTER, SEYMOUR and WARTNICK told plaintiffs and other employed at the Sunnyvale Facility that documented counseling or OLCC

-42-

do not count towards the documented disciplinary actions that might result in termination, and that such types of discipline were not serious cause for appeal to GFT Processes;

B.   At various time more specifically set forth above, defendants MATTHEWS, MOTTER, SEYMOUR, SUAZO and WARTNICK told plaintiffs and other minority employees employed at the Santa Clara Facility that documented counseling or OLCC do not count towards the documented disciplinary actions that might result in termination, and that such types of discipline were not serious cause for appeal to GFT Processes;

C.   At various time more specifically set forth above, defendants FERREY, PERRY, STITES, VANGALDER, PIGORS told plaintiffs and other minority employees at the Oakland Hub that documented counseling or OLCC do not count towards the documented disciplinary actions that might result in termination, and that such types of discipline were not serious cause for appeal to GFT Processes;

D.   At various time more specifically set forth above, defendants CAPRIELLO, MONTEZ, PERRY, VANGALDER, PIGORS told plaintiffs and other minority employees at the San Leandro Facility that documented counseling or OLCC do not count towards the documented disciplinary actions that might result in termination, and that such types of discipline were not serious cause for appeal to GFT Processes;

E.   In 1996, when plaintiff WHITE was required to perform the additional job of Shuttle Driver, defendant MOTTER informed him that he drove too little to be eligible for additional compensation as a Shuttle Driver; and

F.   In approximately March 2002, defendants instigated an investigation of plaintiff by a government representative for filing a fraudulent claim for worker's compensation disability benefits.  When the investigator made

-43-

inquiries regarding plaintiff's injuries at plaintiff's workplace, defendant MEEK fraudulently informed the agent that plaintiff was out sick and not due to work-related injuries, despite having been notified by plaintiff of the work-related injury and informed of the doctor's written restrictions at the time of injury. Further, defendants intentionally failed to refer the investigators to the other managers at the facility, with whom plaintiff had spoken in notifying FEDEX of his work-related leave of absence.

159. All of the aforementioned representations were false. The truth was that OLCCs could be used in a termination decision if combined with two other documented disciplinary actions; and that they were serious enough for appeal to GFT if warranted.

160. Moreover, Defendants FEDEX CORP and FEDEX had paid drivers of shuttles who had driven hours comparable to those driven by plaintiff WHITE increased compensation for driving. Furthermore, plaintiff BUTLER had suffered a workplace injury due to defendants' creation of a hostile environment and forcing plaintiff to work in a physically hazardous location.

161. The aforementioned representations by the INDIVIDUAL DEFENDANTS were false, and the INDIVIDUAL DEFENDANTS knew them to be false when made. Moreover, the INDIVIDUAL DEFENDANTS made the aforementioned representations with the intent to defraud plaintiffs, and of inducing plaintiffs or third parties to rely upon said representations and to act/or refrain from acting in reliance thereon.

162. At all times when said misrepresentations were made, plaintiffs were unaware and ignorant of the falsity of the representations. Plaintiffs acted in justifiable reliance upon the truth of the representations.

163. Defendants also engaged in fraudulent activities by altering the time cards of plaintiffs and other minority employees by reducing the number of hours worked by plaintiffs. The results of defendants' fraudulent alterations of plaintiffs' timecards were reductions in the wages that plaintiffs had earned.

164. Plaintiffs were not aware of defendants' widespread, racially discriminatory practice of reducing the number of hours on timecards of minority employees.

-44-

165.   As a direct and proximate result of defendants aforementioned misrepresentations of material facts, plaintiffs have lost rights to appeal disciplinary actions which have influenced employment and termination decisions affecting income and career opportunities; plaintiff WHITE has lost income relating to driving responsibilities, as well as other damages; plaintiff BUTLER has lost workers' compensation benefits; and all plaintiffs have been shorted significant amounts of wages earned; all in amounts to be determined at trial.

166.   Because of their willful deceit and fraudulent conduct, punitive damages are warranted against defendants the INDIVIDUAL DEFENDANTS, including CAPRIELLO, FERREY, HEINZ, JOHNSON, MATTHEWS, MEEK, MONTEZ, MOTTER, PERRY, PIGORS, SEYMOUR, STITES, SUAZO, VANGALDER and WARTNICK in order to punish and make an example of the INDIVIDUAL DEFENDANTS.

## NINTH COUNT

### *QUANTUM MERUIT*

### (Defendants FEDEX CORP and FEDEX)

As and for their Ninth Count for *Quantum Meruit* against defendants FEDEX CORP and FEDEX, plaintiff WHITE, and each of them, allege as follows:

167.   Plaintiff WHITE, and each of them, incorporate by reference the allegations of paragraphs 1 through 166, above, as though fully set forth herein.

168.   Plaintiff WHITE has provided defendants FEDEX CORP and FEDEX with various services requested of them by their managers, and specifically performing the responsibilities of a Shuttle Driver and transporting packages and other freight to and from airports in the Bay Area and picking up deliveries from the offices of several corporate customers in the area.

169.   Defendants FEDEX CORP and FEDEX have a compensation scale and practice of compensating Shuttle Drivers and drivers of shuttles for their services at a rate higher than the pay levels of Handlers and CSA Agents, positions occupied by plaintiff WHITE.

170.   As drivers of shuttles, defendants FEDEX CORP and FEDEX were obligated to pay, in accordance with their compensations scale and guidelines, WHITE for his responsibilities

-45-

as Shuttle Drivers.

171.    Defendants FEDEX CORP and FEDEX have failed to provide plaintiff WHITE with the additional wages and other compensation to which they are rightfully entitled for hours driving defendants' shuttles.

## TENTH COUNT

### VIOLATION OF CALIFORNIA EQUAL PAY ACT

**(Gov't. Code sections 12900 *et. seq.*)**
**(Defendants FEDEX CORP and FEDEX)**

As and for their Tenth Count for Violation of the California Equal Pay Act against defendants FEDEX CORP and FEDEX, plaintiff, and each of them, allege as follows:

172.    Plaintiffs, and each of them, incorporate by reference the allegations of paragraphs 1 through 171, above, as though fully set forth herein.

173.    Defendants FEDEX CORP and FEDEX have violated the California Equal Pay Act, Government Code sections 12900 *et. seq.*, which makes it unlawful for an employer to pay different wages based on the race or gender of employees who are performing "substantially similar work" in the same establishment.

174.    Plaintiff WHITE is informed and believe, and based thereon allege, that defendants FEDEX CORP and FEDEX compensated plaintiff, and WHITE and other minority drivers of shuttles at the Sunnyvale Facility at levels significantly less than that of their Caucasian colleagues, despite the fact that the Caucasian Shuttle Drivers performed the same jobs as plaintiff WHITE; and that plaintiff WHITE had more seniority with FEDEX than such Caucasian Shuttle Drivers.

175.    Plaintiffs are informed and believe, and based thereon allege, that defendants FEDEX CORP and FEDEX do not have an identifiable, standard seniority system that is fairly and systematically applied and observed, which might explain the discrepancies between plaintiffs' salary and the salaries of the Caucasian employees performing identical or comparable jobs in their respective facilities.

176.    As a direct and proximate result of defendants FEDEX CORP and FEDEX's violation the California equal pay provisions, plaintiffs, and each of them, have suffered loss of

-46-

income, loss of advancement and promotion, loss of career opportunity and loss of intangible job benefits, all in amounts to be proven at trial.  As further proximate result of the above-described equal pay violations, plaintiffs, and each of them, have experienced pain, suffering, severe emotional distress, mental distress, shame, humiliation, embarrassment, and related physical ailments all in amounts to be proven at trial.

## ELEVENTH COUNT

### INJUNCTIVE RELIEF

#### (All Defendants)

As and for their Eleventh Count for Injunctive Relief to Prevent Further FEHA Violations against all defendants, all plaintiffs, and each of them, allege as follows:

177.    Plaintiffs have no adequate remedy at law to prevent reoccurrence of such long-standing, widespread and deep-rooted racially and/or gender-based discriminatory practices and harassment, or to prevent retaliation against plaintiffs for complaining of and objecting to such long-standing, widespread and deep-rooted racially and/or gender-based discriminatory practices and harassment.

178.    Injunctive relief is necessary and proper to prohibit a reoccurrence of such long-standing, widespread and deep-rooted racially and/or gender-based discriminatory practices and harassment and to prohibit retaliation against plaintiffs for complaining of and objecting to such long-standing, widespread and deep-rooted racially and/or gender-based discriminatory practices and harassment.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs, and each of them, pray for relief as follows:

1.    For general damages in amounts according to proof;

2.    For special damages in amounts according to proof;

3.    For punitive damages in an amount sufficient to punish and make an example out of defendants;

4.    For injunctive relief to prohibit the racially-discriminatory and gender-based discriminatory practices and harassment described herein;

-47-

5.   For attorneys' fees as provided by law;

6.   For pre-judgment interest as provided by law;

7.   For costs of suit incurred herein; and

8.   For such other and further relief as the Court deems fair and just

Dated: January 9, 2004                    **LAW OFFICES OF WAUKEEN Q. McCOY**


By:  /s/  *Waukeen Q. McCoy*
        Waukeen Q. McCoy
        Co-Counsel for Plaintiffs

Dated: January 9, 2004                    **LAW OFFICES OF KAY M. PARKER**


By:  /s/  *Kay McKenzie Parker*
        Kay McKenzie Parker
        Co-Counsel for Plaintiffs

AMENDED COMPLAINT                                        CASE NO. 04-0099 SI